**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| **JULIANA DABOH,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **CIVIL ACTION NO. 3:06-CV-1006-O** |
| | § | |
| **BAYLOR HEALTH CARE SYSTEM** | § | |
| **OCCUPATIONAL INJURY BENEFIT** | § | |
| **PLAN, NO. 513,** | § | |
| | § | |
| **Defendant.** | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The parties moved the Court to try this case upon written submissions. *See* Doc. # 20.  The

Court granted this request and after considering the evidence presented, the parties' arguments, and

the relevant authorities, finds and concludes as set forth below.

### I. SUMMARY BACKGROUND

Plaintiff, Juliana Daboh ("Daboh"), was employed with Baylor Medical Center at Garland

("Baylor") as a registered nurse beginning in 1997.  Doc. # 22 ("Pl's App.") at 1; Doc. # 23 (Def's

App.") at 2..  Baylor created the Baylor Health Care System Occupational Injury Benefit Plan, No.

513 (the "Plan") which provided its employees wage replacement and medical benefits if they

became injured on the job, instead of providing them workers compensation insurance.  Doc. # 1

("Pl's Cpl.") at 2, ¶ 7; Doc. # 6 ("Def's Ans.") at 1, ¶ 7.  As a Baylor employee, Daboh was covered

by the Plan.  Def's App. at 173, 178.

Daboh was working at Baylor on the evening of July 27, 2005.  In the scope of her duties,

Daboh was assisting a patient when she experienced pain in her neck after the patient grabbed her

(the "2005 work injury").  Def's App. 56.  She was seen in the emergency room the following day and diagnosed as having a neck sprain.  *Id.* at 46, 56.  Daboh was later seen and treated by Dr. Christine Johnson, an approved physician under the Plan.  *Id.* at 2, 37, 38, 46.  On August 5, 2005, Dr. Johnson directed Daboh to undergo an MRI which revealed she had a disk bulge at C4-C6.  *Id.* at 3, 32, 36.  On August 31, 2005, Dr. Johnson concluded that Daboh's symptoms from her neck strain were resolved.  Dr. Johnson noted that Daboh had been referred to Dr. Michael, a nuerosurgeon, for further evaluation, and that Daboh was also consulting with Dr. Andrew Park. *Id.* at 3, 22, 23, 27-29.

Prior to her 2005 work injury, Daboh had other spinal problems.  *Id.* at 75-76.  In 1996, Daboh had a lumbar laminectomy due to toe pain.  *Id.* at 75.  She also had an MRI in 2003 for neck pain and numbness in her extremities.  *Id.* at 230.  Daboh also received treatment for problems stemming from a May 2004 motor vehicle accident.  *Id.* at 75.

While being treated by Dr. Johnson, Daboh requested she receive further treatment from Dr. Park instead of Dr. Michael.  *Id.* at 3.  Dr. Park had previously treated Daboh for injuries related to the May 2004 motor vehicle accident.  *Id.* at 75-76, 80, 96.  The Plan approved her request.  *Id.* at 3.

During Dr. Park's treatment of Daboh, he concluded that Daboh's 2005 work injury had not been resolved and that she needed continued treatment.  *Id.* at 11-12.  Ultimately Dr. Park decided surgery was necessary and Daboh requested that the Plan provide coverage for this surgery.  Pl. Cpl. at 2, ¶ 15; Def's App. at 3, 12.  The Plan Claims Administrator (the "CA") denied Daboh's request, concluding her neck strain had resolved and the surgery and further treatment recommended by Dr. Park was for her pre-existing medical condition which was not covered by the policy terms.  Def's

App. at 81-83.

Daboh appealed the administrator's decision to an Appeals Committee (the "AC") established by the Plan. *Id.* at 84, 206. The AC denied Daboh's appeal, again finding that her injury was not covered because it resulted from her preexisting condition. *Id.* at 240-242. Daboh filed this suit challenging the Plan's decision. *See generally* Pl's Cpl.

In this suit, Daboh alleges the CA and AC acted under a conflict of interest because it funded and administered the plan. Pl's Cpl. at 4, ¶¶ 22-30. As a result, she contends she is entitled to a *de novo* review of the Plan's denial of her claim. *Id.* Even if she is not entitled to *de novo* review, she argues the Plan's denial of her claim was arbitrary and capricious. *Id.* Daboh also seeks recovery of attorneys fees. Pl's Cpl. at 4-5, ¶¶ 31. In its answer, Defendant agrees that a *de novo* review is appropriate. *See* Def's Ans. at 3, ¶ 24. However, in other filings it contends abuse of discretion is the proper standard. *See* Doc. # 32.

In accordance with the requirements of Rule 52 of the Federal Rules of Civil Procedure, the Court now examines the applicable law and sets out its findings of fact and conclusions of law.

## II. FINDINGS OF FACT

1.  The Plan is an employee benefit plan covered by the Employee Retirement Income Security Act of 1974 ("ERISA"). Pl's Cpl. at 1, ¶ 3-4; Def's Ans. at 1, ¶ 3-4.

2.  Baylor funded the Plan and its officers or their delegates act as the CA and the AC. Def's App. at 213, 214.

3.  The Plan grants to the CA and the AC the following authority to interpret and exercise authority over the Plan: "Subject to the Plan claim procedures, both the Claims Administrator and the Appeals Committee have discretionary authority to interpret and

3

implement the provisions of the Plan. . . [t]here shall be no de novo review by any arbitrator or court of any decision rendered by the Appeals Committee and any review of such decision shall be limited to determining whether the decision was so arbitrary and capricious as to be an abuse of discretion." *Id*. at 215-216.

4.    Daboh worked for Baylor as a registered nurse beginning May 5, 1997. Def's App. at 2.

5.    Daboh was injured during the course and scope of her employment while she was assisting a patient on July 27, 2005. Def's App. at 2, 22, 25, 58, 241.

6.    Daboh's 2005 work injury was covered by the Plan. Def's App. at 241.

7.    Daboh went to the emergency room on July 28, 2005, complaining of pain related to her 2005 work injury. She was diagnosed as having neck sprain. *Id.* at 46, 56.

8.    Following her emergency room visit, Daboh was treated by Dr. Christine Johnson. *Id.* at 22-23, 46-47. Dr. Johnson ordered an MRI which showed a herniation and disc bulge between C4-C6. *Id.* at 3, 32.

9.    Dr. Johnson referred Daboh to Dr. Michael, a neurosurgeon, because she complained of numbness, tingling, and difficulty walking. *Id*. at 22, 26-28.

10.   Daboh sought and received approval from the Plan to continue treatment with Dr. Park, an orthopedic surgeon who had treated her in the past, instead of Dr. Michael. *Id*. at 3, 75-76, 80, 96.

11.   On August 31, 2005, Dr. Johnson reported that Daboh "reached a resolution of symptoms from her cervical strain" and that "no further physical therapy is planned." *Id*. at 22-23. Dr. Johnson's treatment of Daboh was covered by the Plan because Johnson treated Daboh until she concluded Daboh's neck strain had resolved. *Id*. at 81-82.

4

12.    Daboh experienced injuries unrelated to the 2005 work injury dating back to 1996, including injuries related to a May 2004 motor vehicle accident.  *Id*. at 75-76.

13.    Dr. Park first treated Daboh on November 10, 2004 for back injuries she sustained in her May 2004 motor vehicle accident.  *Id*. at 75.  He saw her twice for this injury, once in November and once in December 2004.[1]  *Id.* at 75-80.

14.    A November 15, 2004 MRI of Daboh ordered by Dr. Park showed a disc bulge/herniation at C4-C5 and C5-C6 which impinged her spinal cord.  *Id*. at 77-80.

15.    Dr. Park last saw Daboh in connection with her May 2004 motor vehicle accident on December 2, 2004.  *Id*. at 80.  At that time, Dr. Park's medical records reflect that Daboh was in more pain on December 2, 2004 than she was during her previous visit with him on November 10, 2004.  *Id*.

16.    On December 2, 2004, Dr. Park recommended conservative treatment until Daboh's acute pain subsided and was controlled, at which point they would consider surgery.  *Id*. at 80.

17.    On August 2, 2005, Daboh visited a physical therapist with Baylor Rehabilitation Services regarding the 2005 work injury.  *Id.* at 42-45.  The physical therapist noted in the "history of present condition" section of Daboh's records that Daboh had been experiencing pain in her neck, on and off, since her 2005 motor vehical accident.  *Id.* at 45.

18.    Dr. Park did not see Daboh again until she saw him after her 2005 work injury.  *Id*. at 96.  When Dr. Park saw Daboh following her 2005 work injury, he concluded that her 2005 work injury was a new injury caused by a separate event unrelated to her

---

[1]  While Dr. Park stated he saw Daboh only once, on November 10, 2004 (Def's App. at 96), medical records included within the administrative record indicate he saw Daboh on November 10, 2004, (Def's App. at 75-76) and on December 2, 2004 (Def's App. at 80).

previous back injuries.  *Id*. at 11-13, 25, 95-98.  He came to this conclusion by comparing her 2004 MRI taken after her May 2004 motor vehicle accident with the MRI taken on August 7, 2005, immediately after her 2005 work injury.  He found these tests showed a marked difference in Daboh's herniation following her 2005 work injury and concluded the 2005 work injury caused this "dramatic change."  *Id*. at 11-13, 25, 95-98.

19.     On August 30, 2005, the Plan's medical doctor, Dr. Barry Smith, concluded Daboh's "prior disease state seems to be exacerbated by this new injury" and that the "proposed surgery is for the long standing degenerative changes."  *Id*. at 25.

20.     The CA denied Daboh's claim on August 31, 2005, based on a review of her medical records and Dr. Smith's report.  *Id*. at 81-82.

21.     On September 12, 2005, Dr. Park wrote to the Plan asking it to reassess its conclusion that Daboh did not continue to suffer from her 2005 work injury.  *Id.* at 11-12.

22.     On September 26, 2005, Dr. Smith wrote a report reassessing Daboh's claim in which he concluded her symptoms "were exacerbated by her lifting injury. . . ." but again concluded that her "surgery need appears to be related to her long standing degenerative cervical changes."  *Id*. at 10.

23.     Daboh appealed the CA's denial of her claim.  *Id*. at 84, 86, 88, 90.

24.     The Plan designated an AC to consider her appeal.  *Id*. at 81-82; 240-242.

25.     During the appeal, Dr. Park responded to various issues related to the Plan's decision to deny coverage.  He wrote that Daboh "ultimately recovered from her [previous] injury. . . ."  *Id*. at 95.  Significantly, he also opined that the 2005 work injury was a "new injury," the result

of a "separate event" which occurred after Daboh made "a full and complete recovery" from the injury caused by the 2004 motor vehicle accident. *Id*. at 96.

26. Dr. Park wrote that the surgery he proposed was needed due to the "large disc herniation causing severe spinal cord compression which was never present before July, 2005." *Id*. at 96. He also disputed Dr. Johnson's conclusion that Daboh's 2005 work injury had resolved and opined that surgery was needed to further address her 2005 work injury. *Id.*

27. Dr. Park is a medical doctor and orthopedic surgeon. Pl's App. at 3.

28. The Plan designated Dr. Cynthia Sherry, Dr. Melissa Tonn, and Dr. Smith to review Daboh's claim on appeal. Def's App. at 240-241.

29. Dr. Sherry is a medical doctor and a Fellow of the American College of Surgeons. *Id*. at 60.

30. On March 26, 2006, Dr. Sherry reviewed Daboh's "multiple imaging examinations and clinical history," including results of an October 6, 2005 cervical myleogram with CT scan not available at the time the CA denied Daboh's claim. Using these documents, Dr. Sherry concluded that a C4-5 disc bulge was present on August 7, 2005, but that a disc protrusion shown on the October 6, 2005 test results had not yet developed. *Id*. at 61. She also observed disc bulge or protrusions between C3-C6 predating the 2005 work injury. *Id.* at 60-61.

31. On March 10, 2006, Dr. Tonn reviewed Daboh's claim. *Id*. at 229-239. She detailed Daboh's history as set out in the medical records provided to her for review. *Id.*

32. Dr. Tonn found that Daboh had an MRI on March 31, 2003, which showed degenerative disc disease between C3-C6. *Id*. at 235. She also considered Dr. Park's November 24, 2004 diagnosis of "multi-level central disc degeneration at C3-4, C4-5 and C5-6 with C4-5 and

7

C5-C6 having the most significant level of canal compromise with central disc bulge impinging on the spinal cord mildly. . ." *Id.*

33.  Dr. Tonn determined that on December 2, 2004, Dr. Park noted a "narrowing of the canal at C5-6 with impingement on the spinal cord at C4-5 and C3-4 . . ." and that Dr. Park's dictated notes of that visit reflected his view that Daboh had "central disc herniation impinging on the spinal cord at C4-5 and at C3-4. . ." *Id.*

34.  Dr. Flynn, at Baylor's Department of Radiology, compared Daboh's x-rays from July 28, 2005 with those of May 27, 2004 and found no acute injury or significant change in Daboh's spondylosis. *Id.* at 234.

35.  Dr. Tonn found that Daboh's description of her pain and discomfort after her 2005 work injury was "essentially identical" with that described in May 2004. *Id.* at 235, 238.

36.  Based on Dr. Park's findings regarding Daboh's condition in 2004, Dr. Tonn questioned Dr. Park's August 29, 2005 statement that the November 2004 MRI showed "absolutely 'no disc herniation . . .'" at C4-C5 and Dr. Park's later February 24, 2006 conclusion based, in part, on those same records that irrefutable evidence exists in the medical records that Daboh's 2005 work injury was a new injury. *Id.* at 235-238. Dr. Tonn wrote that Dr. Park's post-2005 work injury conclusions represented a "marked" discrepancy between the medical records Dr. Park prepared at the time of his 2004 treatment. *Id.* at 237.

37.  Dr. Tonn found no evidence in Dr. Park's records that Daboh ever recovered or reported resolution of the symptoms related to her 2004 motor vehicle accident. Instead, Dr. Tonn found that, during Park's last treatment of Daboh for this incident, Dr. Park reported Daboh was in more pain than she had been in previously. *Id.* at 237.

8

38.     Dr. Tonn concluded that the previous interpretations of Daboh's MRI's and the related

        physical examinations did not support a finding that her 2005 work injury was a new injury.

        *Id*. at 238.

39.     Dr. Tonn is a Board Certified medical doctor in Occupational Medicine.  *Id*. at 239.

40.     The Plan provided coverage for injuries resulting from an accident occurring during the

        course and scope of employment.  *Id*. at 183-184.

41.     The Plan excluded from coverage any preexisting condition unless there was a significant

        aggravation of the preexisting condition; that condition had been previously repaired or

        rehabilitated; and the services are medically necessary to treat the aggravation.  *Id*. at 183-

        184.

42.     The Plan concluded that Daboh's request for benefits was not covered because it was a

        preexisting condition and the AC affirmed this conclusion.  *Id.* at 81-83; 240-242.

43.     Daboh filed this suit challenging the AC decision.  *See generally* Pl. Compl.

44.     The administrative record related to Daboh's claim was attached to the trial submission of

        Baylor.  Def's App. at 1-242 (bates stamped B.0001-B.0242).

45.     A conclusion of law that should be treated as a finding of fact is hereby adopted as such, and

        a finding of fact that should be treated as a conclusion of law is hereby adopted as such.

### III.  CONCLUSIONS OF LAW

        Daboh challenges the Plan's denial of her request for benefits.   ERISA permits plan

participants to initiate suit to recover benefits owed.  *See* 29 U.S.C. § 1132.

        Claims for benefits made under the Plan are submitted to a CA.  Def's App. at 214.  The CA

is charged with making initial benefits determinations.  Def's App. at 214.  When making benefit

determinations, an administrator is required to interpret and construe the terms of the plan and to determine the facts underlying the claim. *Wade v. Hewlet-Packard Dev. Co. LP Short Term Disability Plan*, 493 F. 3d 533, 537 (5th Cir. 2007). An administrator's decision to deny benefits is reviewed under a *de novo* standard unless the terms of the plan confer discretionary authority to determine benefits and interpret the terms. *Lain v. UNUM Life Ins. Co. of Am.*, 279 F.3d 337, 342 (5th Cir. 2002).

The Plan grants the CA and the AC full discretion to construe the terms of the Plan. Def's App. at 215-216. The relevant portion of the Plan reads: ". . . the Claims Administrator and Committee have discretion and authority to interpret and implement the provisions of the Plan . . .[t]here shall be no de novo review by any arbitrator or court of any decision rendered by the committee in review or claim decision shall be rendered to determine whether the decision was so arbitrary and capricious so as to be an abuse of discretion." *Id.* at 215-216. This language sufficiently confers discretionary authority on the CA and the AC in accord with the Fifth Circuit's approach in determining the appropriate standard of review in ERISA cases. *See Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 637 (5th Cir. 1992). Therefore, the court's duty is to determine whether the Plan abused that discretion in interpreting the relevant terms. *See Dowden v. Blue Cross Blue Shield,* 126 F. 3d 641 (5th Cir. 1997). Daboh bears the burden to show that the administrator abused his discretion. *Id.* at 644. In addition, when a plan grants the administrator the authority to interpret the plan, he is also empowered to resolve ambiguities contained within the plan. *See High v. E-Systems Inc.*, 459 F.3d 573, 579 (5th Cir. 2006).

To decide if the administrator abused his discretion in interpreting the Plan, the court employs a two step process established in *Wildbur v. ARCO Chemical Co. See High*, 459 F.3d at

10

577 n.2.  The first step of the *Wildbur* test is to determine whether the administrator employed the legally correct interpretation of the plan ("Wildbur Step 1").  *Id*.  If the court finds the administrator did not employ the legally correct interpretation, the court then determines whether the administrator abused his discretion in varying from the correct interpretation ("Wildbur Step 2").  *Id*.

Plan interpretations

To determine if the administrator's interpretation of the plan was legally correct under Wildbur Step 1, courts evaluates whether the administrator has (1) given the plan a uniform construction; (2) whether the interpretation is consistent with a fair reading of the plan; and (3) whether there are any unanticipated costs resulting from different interpretations.  *Wildbur*, 974 F.2d at 638.  When deciding if the administrator abused his discretion under Wildbur Step 2, courts considers (1) the internal consistency of the plan under the administrator's interpretation; (2) relevant regulations; (3) the factual background surrounding the determination; and (4) any inferences of lack of good faith.  *Id*.  To show an abuse of discretion, evidence outside of the administrative record may be admitted to show how an administrator has interpreted the terms of the plan in other instances.  *Estate of Larry Bratton v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 215 F. 3d 516, 521 (5th Cir. 2000).  If the Court determines that the administrator did not abuse his discretion, there is no need to decide whether he correctly interpreted the plan under Wildbur Step 1.  *High*, 459 F.3d at 577.

Factual Determinations

Regardless of the discretion granted the administrator to interpret the terms, his factual determinations are upheld unless he abuses his discretion.  *Meditrust Fin. Servs. Corp. v. The Sterling Chems., Inc.*, 168 F.3d 211, 213 (5th Cir. 1999).  This requires courts to determine whether

11

the administrator's decision was reasonable. *MacLachlan v. ExxonMobil*, 350 F.3d 472 (5th Cir.

2003). A decision will be found reasonable if there is a rational connection between known facts

and the decision, or between the found facts and the evidence. *Meditrust*, 168 F.3d at 215. Courts

will affirm an administrator's decision if it is supported by substantial evidence. *Id.* Substantial

evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion. *Corry v. Liberty Life Assurance

Co. of Boston*, 499 F.3d 389, 398 (5th Cir. 2007).

Conflict of Interest

An administrator's decision is afforded less deference when the administrator is subject to

a conflict of interest. *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2346 (2008). When an

administrator responsible for evaluating claims also pays the benefits, a conflict exists. *Id.* at 2346-

51. Daboh's allegation that the administrator has a conflict of interest is one factor to consider when

evaluating whether he abused his discretion. *Id.* at 2346. The weight to be given this issue depends

on the circumstances. *Id.* The more evidence of a conflict on the part of an administrator, the less

deference he is entitled. *Vega v. Nat'l Life Ins. Servs., Inc.* 188 F.3d 287, 297 (5th Cir. 1999). When

little evidence of a conflict exists, but no evidence as to the degree is presented, less weight is

afforded the conflict. *Id.*

Daboh's Procedural Objections

Daboh raises several procedural issues related to the AC's consideration of her

administrative appeal. First, she contends Dr. Smith improperly participated in the appeal. *See* Doc.

# 22 ("Pl. Tr. Sub.") at 4. Next, she claims Dr. Sherry and Dr. Tonn do not have the requisite

specialty to review her claim. *See id.* at 5, 23. She also complains the Plan failed to provide her

proper notice of the denial of her claim.  *See id.* at 32.  Finally, she argues the Plan failed to consider evidence she submitted.  *See id.* at 33.  The Court will resolve the procedural issues before turning to the substance of the Plan's decision.

### 1.  Smith's Participation

Daboh complains that Dr. Smith improperly participated in the administrative appeals process.  *See* Pl. Tr. Sub. at 4.  The Plan provides "[w]hen reviewing the appeal of an Adverse Benefit Determination, the Appeals Committee will consult with an Approved Physician [who] will not be an individual who was consulted in connection with the initial Adverse Benefit Determination . . ."  Def's App. at 206.  Dr. Smith participated in Daboh's initial benefit determination and her appeal.  *Id.* at 281-282, 41.  Defendant agrees he should not have participated in Daboh's appeal. *See* Doc. # 23 ("Def. Tr. Sub.") at 17 ("Dr. Smith's brief involvement at the appeals stage is easily excused . . .").  As such, the Court will not consider Dr. Smith's opinion in determining whether substantial evidence supports the AC's decision to deny benefits.

### 2.  Specialty of the Plan's Consultant

Daboh argues the AC abused its discretion because none of the medical consultants it relied on were properly qualified.  *See* Pl. Tr. Sub. at 22-28.  Because Dr. Park was an orthopedic surgeon, she contends the terms of the Plan required the AC to consult with health care physicians in the same discipline.  *Id.* at 23.  The terms of the Plan provide that the AC "will consult with an Approved Physician who has appropriate training and experience in the filed of medicine involved in the medical judgment."  Def's App. at 206.  In addition, Daboh relies on 29 C.F.R. § 2560.503-1(h)(3)(iii) which provides that when deciding appeals of adverse decisions that treatment is not medically necessary, the fiduciary is required to consult with "a health care professional who has

appropriate training and experience in the field of medicine involved in the medical judgment. . . ." 29 C.F.R. § 2560.503-1(h)(3)(iii).

The administrative record reveals Dr. Smith is a medical doctor (Def's App. at 10), Dr. Sherry is a medical doctor and a Fellow, American College of Surgeons (Def's App. at 60) and Dr. Tonn is a medical doctor who is Board Certified in Occupational Medicine (Def's App. at 239)[2]. The Plan terms and ERISA regulations relied on by Daboh are not to be treated "so hyper-technical" as to require a "medical diagnosis by . . . another equally credentialed specialist." *Larque v. SBC Commc'ns Inc. Disability Income Plan and Core, Inc.*, 2005 WL 3447740 at *6 (E.D. Tex. Dec. 14, 2005). In addition, there is no need to consult with medical specialists when the terms of the plan do not specifically require that type of review. *Meditrust*, 168 F.3d at 215. The Plan's medical doctors were qualified to interpret Daboh's medical records and reach conclusions as to her injuries from those records.

### 3. Sufficiency of the Plan's Notice

Daboh also complains that the Plan provided her insufficient notice regarding the denial of her claim. She argues the Plan failed to describe what additional materials were necessary for Daboh to perfect her claim and that the Plan failed to consider additional information Daboh submitted on appeal. *See* Pl. Tr. Sub. at 31-33. This is a procedural complaint directed at the Plan's

---

[2] Defendant provided a curriculum vitae for Dr. Smith and Dr. Tonn to demonstrate they are qualified to review Daboh's claim. *See* Doc. # 24. Daboh argues this is improper because it was not part of the administrative record. *See* Doc. # 27, Pl's Reply to Def's Resp. To Pl. Tr. Sub. at 4-5. The Court accepts Defendant's proffer of its experts' qualifications. *See Vega*, 188 F.3d at 299 (court may consider evidence from outside the administrative record that assists in understanding medical terminology or practice). These documents show Dr. Smith and Dr. Tonn are qualified to review Daboh's claim. However, even without the supplemental information, the Court concludes that Dr. Smith and Dr. Tonn's experience as identified in their correspondence and elsewhere in the administrative record is sufficient to find they were qualified to reach their opinions. Def's App. at 10, 239.

handling of her claim.  *See id.* at 31.  Failure to adhere to ERISA's procedural mandates are evaluated under the substantial compliance standard.  *Lacy v. Fulbright & Jaworski*, 405 F.3d 254, 257 (5th Cir. 2005).  The Plan is required to fulfill the purposes of ERISA's notice requirements, strict compliance is not required.  *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 395 (5th Cir. 2006).  The purposes of ERISA's notice provisions are to ensure that a participant understands the reasons for the denial and the right to seek review of the decision.  *Wade*, 493 F.3d at 539; *Leake v. Kroger Texas L.P.*, 2006 WL 2842024 at *6 (N.D.Tex 2006).

ERISA regulations and the Plan's terms require that the denial letter provide a description of "any additional materials or information necessary for the claimant to perfect the claim and an explain why such material is necessary. . ."  *See* Def's App. at 205; 29 C.F.R. § 2560.503-1(g)(1)(iii).  All of the communications between the Plan and the claimant are considered to determine whether substantial compliance occurred.  *Wade*, 493 F.3d at 539.  Unless the failure to comply with the regulations are continuous and amount to substantive harm, procedural violations do not give rise to a remedy of substantive damages.  *Lafleur v. Louisiana Health Serv. and Indem. Co.*, 563 F.3d 148, 157 (5th Cir. 2009).

The Plan determined that Daboh's request for further treatment and surgery sought benefits related to her preexisting condition and were excluded by the Plan's terms.  In so finding, it reviewed medical records from her previous injuries and those related to her 2005 work injury. Daboh relies primarily on the opinion of Dr. Park when arguing for coverage.  As Dr. Park provided the Plan all information he possessed related to Daboh, there does not appear to be more information that would perfect her claim.  Nor does Daboh point to additional information she would have presented that would bolster her claim.  The initial denial letter informed Daboh the Plan concluded

15

her neck strain had resolved and that further treatment related to her preexisting injuries.  It also referred to the Plan's definition of preexisting condition.  The letter from the AC included similar information.  These letters sufficiently notified Daboh that the Plan concluded her request for benefits were excluded from coverage pursuant to the Plan's definition of preexisting conditions.  Daboh has not shown prejudice by any failure to substantially comply with this notice requirement.

      4.  <u>Additional Evidence</u>

      Finally, Daboh submitted additional material to the Plan on March 29, 2006, April 20, 2006 and May 5, 2006.  *See* Pl's App. at 33.  She contends the Plan did not consider this material. Defendant concedes that the additional information can be considered part of the record in this suit. *See* Def. Resp. to Pl. Tr. Sub. at 18 (*citing Vega*, 188 F.3d at 300 for the proposition that additional information submitted by the claimant to the administrator before filing suit can properly be considered part of the administrative record).  Therefore, the Court will consider the material submitted in Daboh's Appendix to her Trial Submission when considering whether the Plan abused its discretion.

      <u>Baylor's Conflict of Interest</u>

      Baylor created, funded, and administered the Plan.  Def's App. at 213-214.  In *Metropolitan Life Ins. Co. v. Glenn*, the Supreme Court held a conflict exists when the administrator who evaluates claims is also required to pay the claims.  *Metropo. Life Ins*, 128 S.Ct. at 2348.  Therefore, Baylor has a conflict of interest.  District courts are to consider the conflict as a factor when deciding whether the administrator abused its discretion.  *Id.* at 2350.  No information concerning the degree of the conflict has been presented, therefore the Court takes into account the conflict when determining whether the Plan abused its discretion but affords the conflict less weight than it might

had other evidence been presented describing more of a conflict.[3]  *See Vega*, 188 F.3d at 297.

The Plan's Coverage Determination

This case centers on the Plan's definition of "Injury" and "Preexisting Condition."  The Plan

defines those terms as follows:

The Plan pays benefits only on account of an "Injury."  An "Injury" means damage or harm . . . resulting from . . . an "Accident" . . . during . . . the Course and Scope of Employment.

. . .

The term "Injury," as used in this booklet, does *not* include:

> Any strain, degeneration, damage or harm to, or disease or condition of, the eye or musculoskeletal structure, or other body part resulting from:
   • poor or inappropriate posture;
   • the natural results of aging;
   • osteoarthritis, arthritis, or degenerative process (including, not limited to, degenerative joint disease, degenerative disc disease, degenerative spondylosis/spondylolisthesis and spinal stenosis ("Non-Covered Injuries");

. . .

> Any Preexisting Condition, except to the limited extent (if any) that an Approved Physician clearly confirms an identifiable and significant aggravation (incurred in the Course and Scope of Employment) of a Preexisting Condition; provided however, that
   • coverage for such aggravation will be provided only if and to the extent that the Approved Physician -
   > confirms that the Preexisting Condition has been previously repaired or rehabilitated; and
   > prescribes services or supplies that are medically necessary to treat such aggravation and likely to return you to pre-Injury status; and

---

[3]  In a letter to the Court, Daboh asked for additional discovery following the *Metropolitan Life* decision.  Defendant opposed this request.  Before the *Metropolitan Life* decision, the Fifth Circuit adopted a sliding scale evaluation when considering conflicts of interest.  *Vega, supra.*  Daboh has argued a conflict of interested existed since the inception of this case in 1996.  *See* Pl. Cpl. ¶ 26.  Again in 2007, Daboh cited *Vega* for the proposition that the greater the evidence of conflict the less deference accorded the Plan under the abuse of discretion standard.  Pl. Tr. Sub., p. 3-0-31.  Based on Daboh's longstanding knowledge that the conflict of interest was an issue, the Court declines to re-open discovery well after the discovery deadline.

- no coverage will be provided if the Preexisting Condition was a major contributing cause of the Injury.

Def's App. at 183-184.

Daboh does not assert the administrator improperly interpreted the Plan. Rather, she complains the Plan abused its discretion when it denied her benefit eligibility for the surgery and other treatment Dr. Park prescribed. *See* Pl. Resp. to Def. Tr. Sub., p. 1 (". . . there is no dispute regarding the terms of the Plan, but rather the Plan's abuse of discretion by failing to consider that Daboh demonstrated she was entitled to benefits based on the terms of the Plan."); *see also* Pl. Tr. Sub., p. 17 ("[t]he issue for the Court's review is whether the Plan had substantial evidence . . . upon which to base its termination of benefits."). Therefore, the *Wildbur* factors need not be considered in this case. *See Meditrust*, 168 F. 3d at 215 (deciding medical needs of a patient through medical records is a factual determination subject to abuse of discretion). Instead, the Court will consider whether substantial evidence support the Plan's decision to deny Daboh's claim. *Ellis v. Liberty Life Assurance Co.*, 394 F.3d 262, 272 (5th Cir. 2004) ("[t]he law requires only that substantial evidence support a plan fiduciary's decisions, including those to deny or to terminate benefits, not that substantial evidence . . . exists to support the employee's claim . . .").

This dispute revolves around the competing beliefs of whether there is substantial evidence in the administrative record to show Daboh's 2005 work injury was resolved and whether her injury from the 2004 motor vehicle accident had been rehabilitated or repaired prior to her 2005 work injury. These issues are central to the dispute because the Plan provides coverage for preexisting conditions and diseases when the preexisting condition is (1) aggravated due to an Accident; (2) the preexisting condition was repaired or rehabilitated; and (3) medically necessary services are prescribed to treat the aggravated condition. *See* Def's App. at 183-184. Therefore, if Daboh's 2005

18

work injury was resolved, no further treatment is needed to treat the aggravated condition according to the third factor in the Plan's definition for when a preexisting condition is covered.  And, if her injuries had not been repaired or rehabilitated prior to her 2005 work injury, the second factor in the Plan's definition of preexisting coverage excludes her claim.  The absence of anyone factor would bar coverage for Daboh's preexisiting condition.  *See* Pl. Tr. Sub., p. 3-4.

The Initial Denial

The Plan initially determined Daboh's claim should be denied based on the CA's review of her medical records and Dr. Smith's opinion.  Def's App. at 22, 28, 82, 241.  The CA concluded "any future treatment needed, is solely related to preexisting injuries. . ."  *Id.* at 81-82.

The Court concludes substantial evidence in the administrative record supports the Plan's initial decision that Daboh's medical records showed her neck strain from the 2005 work injury had resolved when the Plan denied her claim, and that the proposed surgery was needed for her preexisting condition.  *Id*. at 81-82.  First, substantial evidence in the administrative record shows Dr. Johnson concluded Daboh had recovered from her neck strain.  *Id*. at 22-23.  Since the Plan only covers treatment for preexisting injuries designed to return the employee to their pre-injury state, the CA was justified in its belief that the work injury had returned her to pre-injury status, and in denying Daboh's claim on this basis.

In addition, the administrative record shows the Plan's medical director, Dr. Smith, reviewed Daboh's medical records and determined that the additional treatment proposed by Dr. Park related to Daboh's long standing spinal problems.  Def's App. at 25.  In reaching this conclusion, he noted that the issues Daboh sought coverage for were present in the medical records pre-dating her 2005 work injury, i.e. disc herniation impinging on her spinal cord.  *Id.*  Since the Plan covers preexisting

injuries only to the extent necessary to return the patient to pre-injury status, substantial evidence in the record supports the administrator's conclusion that factor three of the Plan's definition of preexisting condition required the denial of Daboh's claim. This necessarily meant the further treatment and surgery she needed was for her preexisting condition.

On September 12, 2005, Dr. Park wrote the Plan to request reconsideration of its decision to deny coverage. *Id.* at 11. In that letter, he argued that the 2005 work injury caused a dramatic change to Daboh's previous condition and the surgery was needed to address the symptoms of that change. *Id.* On September 26, 2005, Dr. Smith reviewed Daboh's claim again, discovered the results of an MRI taken of Daboh in 2003, and stood by his conclusion that the requested surgery was not due to the 2005 work injury but related to her long standing back conditions. *Id.* at 9, 10. Dr. Smith wrote that Daboh's medical records showed an "abutment of the cord" dating back to 2003 and this supported his belief that the surgery Dr. Park proposed was needed due to "long standing cervical changes." *Id.* While Dr. Park and Dr. Smith disagreed as to this conclusion, substantial evidence in the record existed justifying the Plan's conclusion. *See Corry*, 499 F.3d at 401 (the job of weighing valid conflicting medical opinions belongs to the administrator).

Daboh's Appeal

Daboh notified the Plan she intended to appeal this decision. Def's App. at 84, 88. The Plan notified the AC and forwarded her information to the committee for its consideration. *Id.* at 84. On appeal, the Plan asked, among others, Dr. Melissa Tonn to review the medical records associated with Daboh's claim and to provide an opinion. *Id.* at 229-239. In a detailed report, Dr. Tonn explained why she believed Daboh's claims were not covered by the Plan. *Id.* She determined that in 2004, Dr. Park noted a narrowing of Daboh's "canal at C5-6 with impingement on the spinal cord

at C4-5 and C3-4 . . ." and that Daboh had "central disc herniation impinging on the spinal cord at C4-5 and at C3-4. . .".  *Id.*  Dr. Tonn concluded there was no substantive change in Daboh's complaints between the diagnosis of her 2004 motor vehicle injuries and those following her 2005 work injury.  *Id.* at 235, 238.

Based on the medical reviews of Drs. Tonn, Smith and Sherry[4], the AC concluded Daboh's neck strain caused by her 2005 work injury was treated and healed and that further medical treatment was related to Daboh's preexisting condition.  Def's App. at 240-241.  Accordingly, it denied her request for benefits because the Plan excluded coverage for preexisting conditions.  *Id.* at 240-241.

When reviewing this decision, the Court is limited to determining if substantial evidence in the record exists to support the Plan's conclusion that Daboh's claim for benefits are properly excluded under the relevant terms of the Plan.  *Ellis*, 394 F.3d at 272.  Daboh argues that Dr. Park

---

[4]  Daboh argues these experts provide no basis for the Plan to deny her claim.  She contends that Dr. Smith's opinion cannot be considered by the AC because he consulted on the initial denial (Pl. Tr. Sub., p. 28), that Dr. Sherry provided no opinion as to the Plan's coverage of Daboh's claim (Pl. Tr. Sub., p. 4-5, 28-29), and that Dr. Tonn only opined that all of Daboh's test results needed to be re-evaluated (Pl. Tr. Sub., p. 13, 28-29).

As stated above, the Court will not include Dr. Smith's report when considering whether substantial evidence exists to support the AC's final decision.  *See* p. 12, *supra.*

With respect to Dr. Sherry, the Court finds her review was properly considered by the AC and by Dr. Tonn in Dr. Tonn's review of Daboh's claim even though Dr. Sherry does not offer an opinion on the ultimate issue of coverage.  Further, the AC can properly consider her factual findings when making its own determination as to coverage.

And finally, Daboh argues Dr. Tonn's opinion cannot provide substantial evidence because all she did was suggest that all of Daboh's tests be sent to a single radiologist for review.  The Court does not accept Daboh's characterization of Dr. Tonn's report.  In addition to recommending that all of the films be reviewed by one person, Dr. Tonn concluded there was no evidence that Daboh's 2004 injuries had been repaired or rehabilitated and that Dr. Park's conclusion that the 2005 work injury was a new injury was not supported by his medical records.  Def's App. at 237-238.  Her report will be used to determine whether the Plan's decision was based on substantial evidence.

is the only physician aware of Daboh's condition before and after the 2005 work injury and therefore his opinion that her 2005 work injury meets all three factors of the terms of the Plan's definition of preexisting condition should be controlling. *See* Pl. Tr. Sub. at 15. The Court disagrees.

Dr. Tonn credibly called into question Dr. Park's 2005 and 2006 opinions of Daboh's injuries. In 2004, Dr. Park determined Daboh suffered from disc bulge/herniation which pressed against her spinal cord, causing Daboh acute pain. Def's App. at 77-80. Dr. Park was contemplating possible surgery for Daboh at that time but she did not return to see him again until after her 2005 work injury. *Id*. at 80, 96. Therefore, Dr. Park's 2005 and 2006 conclusion that Daboh's 2004 motor vehicle injuries had been repaired or rehabilitated seems to be without foundation in the record since the last time he saw her before the 2005 work injury she left his office in acute pain and he believed she might need surgery. In addition, Dr. Tonn raised serious questions concerning Dr. Park's 2005 report finding no disc herniation between C4-C5 in 2004 because his medical records from 2004 show he diagnosed her with disc herniation between C3-C5. Def's App. at 235. Dr. Tonn's review of the medical records lead her to conclude the objective evidence indicated that Daboh's pre- and post-2005 work injury conditions and symptoms were "essentially identical." *Id.*

Reviewing the administrative record, the Court finds the Plan's decision to deny coverage was reasonable based on all of the medical records presented. Further, it was reasonable for the Plan to rely on Dr. Tonn's opinion when deciding whether Daboh's claim was covered by the Plan. Dr. Tonn conducted a thorough review of Daboh's medical information pre-dating and post-dating the 2005 work injury. She determined that Daboh's 2005 work injury was resolved during Dr. Johnson's treatment and that Daboh's request for benefits were for her preexisting back condition.

The Plan reasonable relied on this opinion.  The Court finds that there is a rational connection between concrete facts in the administrative record and the decision to deny coverage under the Plan's definition of preexisting condition.  *See Meditrust*, 168 F. 3d at 215.  That the opinion of Dr. Tonn conflicted with that of Dr. Park is a matter for the Plan to resolve.  *See Corry*, 499 F.3d at 401.  The Plan did not abuse its discretion by relying on Dr. Tonn's opinion over Dr. Park's, particularly when taking into account Dr. Park's inconsistent conclusions.

Daboh contends that none of the Plan's physicians focused on the three factors set out in the Plan's definition of preexisting conditions.  The Court does not agree.  Dr. Tonn specifically addressed factors two and three in her report and found the medical records show Daboh's 2005 work injury was resolved (factor three) and the medical records show her 2004 motor vehicle injury had not been repaired or rehabilitated (factor two).  Def's App. at 45, 234, 237.  No one appears to dispute that the 2005 work injury aggravated or exacerabted Daboh's preexisting condition.  *See* Pl. Tr. Sub., p. 13; Def's App. at 10.  In addition, even if the Plan did not specifically address each issue, there is no requirement that the Plan refute all evidence a claimant offered.  *Leake*, 2006 WL 2842024.

Based on the administrative record, the Court concludes the Plan's decision falls within the continuum of reasonableness, was not an abuse of discretion, and should be affirmed.  *MacLachlan*, 350 F.3d at 478.  Daboh's claim against Defendant is dismissed with prejudice.

Signed this 22nd day of June 2009.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**